## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

     Plaintiff,

vs.

EDEN FOODS, INC.,

     Defendant.

Case No.: 22-10881
Hon. Bernard A. Friedman

Hon. Kimberly G. Altman,
Magistrate Judge

---

JULIE YEITER,

     Plaintiff-Intervenor,

vs.

EDEN FOODS, INC., and
MICHAEL POTTER,

     Defendants.

---

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Eden Foods, Inc. and Michael Potter, through their attorneys Nemeth Bonnette Brouwer PC and Hooper Hathaway, P.C. and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.1 of the Local Rules of the United States District Court for the Eastern District of Michigan, move for summary

judgment on all claims in Plaintiffs' Complaints. There is no dispute as to any material fact, and Defendants are entitled to judgment as a matter of law. In support of this Motion, Defendants rely on the reasons and authority cited in the attached Brief in Support and state:

1.     On April 25, 2022, Plaintiff Equal Employment Opportunity Commission (EEOC) initiated this action against Eden Foods, Inc. under Section 703(a)(1) of Title VII of the Civil Rights Act, alleging "unlawful employment practices" on or after January 2017. [ECF No. 1, PageID.1-10]   According to the EEOC, in addition to seeking relief for Charging Party Julie Yeiter, it also seeks relief for three "other aggrieved parties." Those parties were not named in the EEOC's Complaint, but were named in response to Defendants' discovery requests on August 17, 2022.

2.     On April 28, 2022, the Court granted the Motion to Intervene by Plaintiff Julie Yeiter, who then filed a Complaint the same day. [ECF No. 5, PageID.36-48]

3.     Defendants timely answered Plaintiff's and Intervening Plaintiff's Complaints on May 19, 2022, and June 17, 2022, respectively. [ECF No 12, PageID.64-75; ECF No. 15, PageID80-98]

4.     Based on the Court's scheduling order of February 1, 2023, the discovery deadline has passed, and the dispositive motion deadline is June 29, 2023. [ECF No. 37, PageID.405-406]

5.     Plaintiff EEOC's Title VII hostile work environment/sexual harassment claims should be dismissed because the alleged incidents of harassment (which Defendants deny) are not sex-based, are not severe or pervasive, and are otherwise insufficient to support an actionable claim.

6.     Plaintiff Yeiter's Title VII and ELCRA sexual harassment claims should be dismissed because the alleged incidents of sexual harassment (which Defendants deny) are legally insufficient to constitute actionable hostile work environment claim.

7.     Plaintiff Yeiter's Title VII and ELCRA claims of retaliation should be dismissed because she cannot show that, but for her alleged protected activity, she would not have been discharged.

8.     On June 29, 2023, counsel for Defendants sought concurrence from Plaintiffs' counsel, but that concurrence was not obtained.

9.     Accordingly, this Court should enter summary judgment in favor of Defendants on all claims in Plaintiffs' Complaints.

Respectfully submitted,

NEMETH BONNETTE BROUWER PC


/s/ Deborah Brouwer
Deborah Brouwer (P34872)
Attorneys for Defendants Eden Foods, Inc. and Michael Potter
200 Talon Centre Drive, Suite 200
Detroit, MI 48207
(313) 567-5921
dbrouwer@nemethlawpc.com


HOOPER HATHAWAY, P.C.


/s/ Angela Jackson
Angela Jackson (P53930)
Attorney for Defendant Michael Potter
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
ajackson@hooperhathaway.com

Dated: June 29, 2023

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

       Plaintiff,

vs.

EDEN FOODS, INC.,

       Defendant.

_____

JULIE YEITER,

       Plaintiff-Intervenor,

vs.

EDEN FOODS, INC., and
MICHAEL POTTER,

       Defendants.

Case No.: 22-10881
Hon. Bernard A. Friedman

Hon. Kimberly G. Altman,
Magistrate Judge

_____

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Introduction** ...................................................................................................1

**Factual Background** .........................................................................................1

    Julie Yeiter ......................................................................................5

    Scout Holaday Delicato ....................................................................9

    Tessa Sarapo ..................................................................................11

    Kaitlyn Dear ..................................................................................15

**Argument** ......................................................................................................17

    I.   Legal Standard ........................................................................17

    II.  The Sexual Harassment Claims Are Legally and Factually Insufficient .......17

    III. Yeiter Was Not Discharged In Retaliation for Protected Activity.................22

**Conclusion**.....................................................................................................**25**

# INDEX OF AUTHORITIES

## Rules

Fed.R.Civ.P.56(a)......................................................................................................17

Fed.R.Civ.P.56(c)1)(B)............................................................................................17

## Cases

*Baugham v. Battered Women.*, 211 F. App'x 432 (6th Cir. 2006) ..........................20

*Beard v. AAA of Michigan*, 593 F. App'x 447 (6th Cir. 2014) ................................23

*Boshaw v. Midland Brewing Co.,* 32 F.4th 598 (6th Cir. 2022).............................24

*Bowman v. Shawnee State Univ.,* 220 F.3d 456 (6th Cir. 2000) ............................18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).......................................................17

*Clark v. UPS.,* 400 F.3d 341 (6th Cir.2005) ...........................................................19

*Doss v. Mich. Dep't of Corr.*, 2022 WL 1086371 (E.D. Mich. Apr. 11, 2022).......23

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)................................... passim

*Harris v. Forklift Syst.*, 510 U.S. 17 (1993).............................................................18

*Hawkins v. Anheuser-Busch.*, 517 F.3d 321 (6th Cir. 2008) ..................................19

*Hensman v. Riverview,* 2008 WL 821940 (E.D. Mich. March 26, 2008) ..............20

*Jackson v. Gen. Cty. Rd. Comm'n,* 999 F.3d 333 (6th Cir. 2021) ..........................23

*Khalaf v. Ford Motor Co.,* 973 F.3d 469 (6th Cir. 2020), *cert. denied*, 2021 WL 1163791...................................................................................................................19

*Morris v. Oldham Cty.,* 201 F.3d 784 (6th Cir.2000)....................................... 19, 23

*Mullendore v. Belding*, 872 F.3d 322 (6th Cir. 2017) .............................................17

*Nathan v. GLWA*, 992 F.3d 557 (6th Cir. 2021)............................................... 18, 21

*Niswander v. Cincinnati Ins.,* 529 F.3d 714 (6th Cir.2008) ...................................23

*Phillips v. UAW,* 854 F.3d 323 (6th Cir. 2017) .......................................................19

*Reeves v. Sanderson Plumbing,* 530 U.S. 133 (2000) ............................................22

*Shaull v. Mich. Affiliated Health Care,* 1998 WL 1989810 (Mich. App. Sept. 22, 1998) ...................................................................................................................20

*Sperle v. Mich. Dep't Corr.,* 297 F.3d 483 (6th Cir. 2002) ....................................19

*Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981) ............................22

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338 (2013)...................................23

*Waldo v. Consumers Energy,* 726 F.3d 802 (6th Cir. 2013) ...................................18

*Wasek v. Arrow Energy Servs.*, 682 F.3d 463 (6th Cir. 2012) ................................18

## STATEMENT OF ISSUES PRESENTED

I.     Whether the EEOC's Title VII sexual harassment claim should be dismissed because the alleged harassment was not based on sex, not severe or pervasive and insufficient to support a hostile work environment claim?

II.     Whether Intervening Plaintiff Julie Yeiter's Title VII and ELCRA sexual harassment claim should be dismissed because the alleged harassment was not based on sex, not severe or pervasive and insufficient to support a hostile work environment claim?

III.     Whether Intervening Plaintiff Julie Yeiter's Title VII and ELCRA retaliation claim should be dismissed because the undisputed evidence is that she was discharged not for protected activity but due to failed work performance and insubordination?

## INTRODUCTION

The EEOC filed this questionable lawsuit after a 2 -year investigation into a charge filed by a former manager at Eden Foods, claiming that she was fired for participating in other EEOC investigations (which she had not done). Eventually, the EEOC asked Yeiter to amend her Charge, to allege sexually harassment—a claim she had never before made. The EEOC then dismissed the retaliation charge that had started the process, finding it without merit. Ultimately, the EEOC sued on behalf of Yeiter and three allegedly aggrieved parties – Scout Holaday, Tessa Sarapo and Kaitlyn Dear. None of these three filed charges with the EEOC, and all were solicited to participate in this suit by the EEOC. [Ex. 1 -Holaday 12, 100; Ex. 2 - Sarapo 9, 146; Ex. 3 - Dear 8, 117]  As the record demonstrates, the EEOC's case rest on disgruntled employees who never complained of harassment, whose allegations are legally insufficient to constitute harassment, and whose own conduct undercuts their claims.

## FACTUAL BACKGROUND

Eden Foods, Inc. is one of the oldest and most respected natural and organic food companies in North America. Its products are marketed and distributed throughout the United States, Canada and overseas. The company was founded in the late 1960s in southeastern Michigan by young people looking for opportunities to foster diets rich in whole grain, and seasonal, local, plant-based food. Eden Foods is headquartered in Clinton, Michigan, but has facilities in Detroit, Indiana, and

California. Eden Foods employs approximately 150 employees.[1] [Ex. 4 - Laing 51]

Michael Potter, Eden's President and Board Chair, is 73 years old. He began at Eden Foods as an employee in the late 1960s, where his early job duties included cleaning coolers in the Eden Foods store.  He is a marketing-oriented President who spends roughly half of his days in the marketing department overseeing Eden's marketing and messaging efforts. [Ex. 5 -Potter I, 27] Potter's management style is admittedly colorful.  He is blunt and direct when necessary to address performance issues and workplace misconduct.  He is not afraid to use harsh adjectives in his counseling of employees. [Potter I, 242] Many employees, including each of the alleged aggrieved parties and Yeiter, found this management style difficult to handle. It is axiomatic, however, that having a tough boss does not violate the law.[2]  Record evidence, created contemporaneously, demonstrates that the alleged aggrieved parties' true dissatisfaction with Potter and Eden sprung from his management style, not sexual harassment. [Exs. 9-11]

Sherri Laing is currently the Executive Vice President of Eden Foods, with a long history in human resources, including more than ten years at Ford Motor Company. [Laing 10, 17, 23]  She was hired in the human resources role at Eden

---

[1] https://www.edenfoods.com/about/, last accessed on June 28, 2023.
[2] *See, e.g.*, *Khalaf v. Ford Motor Co.,* 973 F.3d. 469, 486-87 (6th Cir. 2020) (Jury finding of hostile work environment reversed where the allegations were that supervisor pounded a table with fist, shouted demeaning comments and barked commands "like a dog.")

Foods and later promoted to her current role, while retaining human resources responsibilities. [Id. at 25, 28, 47] Laing testified that she has never received a complaint of sexual harassment from any Eden employee, including the alleged aggrieved parties, and that there have been no reports of sexual harassment to the anonymous complaint hotline, which has been in place since 2020. [Laing 56, 119]

Eden's Handbook includes a robust Sexual Harassment policy, which neither Yeiter nor any of the allegedly aggrieved parties followed. [Ex. 12] All Eden employees have received sexual harassment training, and the required federal and state EEO posters are posted throughout the workplace.  The posters clearly describe what employees should do if they believe they have been subject to unwelcome sexual harassment, and include contact information for the EEOC, including its website, email address, and telephone number, available to whoever wishes to report a complaint. [Ex. 13] None of the alleged aggrieved parties or Yeiter availed themselves of these resources.  [Ex. 7 -Yeiter 239-241; Holaday 100, 123-24; Sarapo 146, 173; Dear  116-117]

Eden Foods' headquarters includes a main administration building, a store and production area. [Laing 217-218] The company also employs a marketing team to promote the brand and company with cohesive messaging, working out of a separate building, a former house repurposed as office space, next door to the administrative building. Most of the marketing team members work in an open area, the house's

3

former living and dining rooms. [Potter I, 34]   The team includes a social media coordinator, graphic designers, and others who plan and prepare content for Eden Foods's marketing materials and product labeling. The department works closely with Potter to create marketing communications and social media messages that contain appropriate information about Eden Foods' products. Potter has been closely involved in all aspects of Eden Foods' marketing for many decades. [Potter I, 88]

This case is a *far* cry from an actionable sexual harassment case.  There are no allegations of unwelcome groping or "quid pro quo" harassment. There are no propositions, no pornography or other sexually explicit messages or conduct.  The EEOC and Yeiter cannot produce a scintilla of documentary evidence from Potter that includes any of these things.  The record includes thousands of pages of emails and texts to and from Potter and not one includes even an iota of sexual content. Erica Hartmann, who took over as Marketing Manager after Julie Yeiter was discharged, and who worked closely with Potter, testified that the conduct complained of by the alleged aggrieved parties was simply not sexual in nature. Hartmann testified "I don't feel that there was any sexual energy behind anything that he did. . . . I didn't see it that way." [Ex. 8 -Hartmann 29-30]

The EEOC brought a single count under Title VII Section 703(a)(1), claiming that Potter and Eden Foods violated the prohibitions against sex discrimination by creating a hostile work environment.  Yeiter asserted retaliation under Title VII and

ELCRA, and an ELCRA claim for hostile work environment sexual harassment.

## Julie Yeiter

The EEOC's sexual harassment suit was brought on behalf of Yeiter, based on the charges she filed with the EEOC. [ECF No. 1] Yeiter then intervened to assert state law claims of sexual harassment and retaliation against Eden Foods, and Michael Potter individually. [ECF No. 5] Both claims are weak; in fact, her sexual harassment claim is so weak that she failed to raise it in her August 22, 2019 EEOC charge. [Ex. 14] She was eventually asked by the EEOC to amend her charge to add an additional claim for sexual harassment. [Ex. 15] She complied on June 3, 2020, nearly a year after her original complaint of retaliation. That claim is also weak, as shown by the EEOC's dismissal of it at the administrative stage, and its decision not to include it in this litigation. [Ex. 16]

In January 2018, Potter offered Yeiter the role of Marketing Manager of the Marketing Department. Yeiter accepted, although she had no real management experience. [Yeiter 35-6, 51] Yeiter's successor, Erica Hartmann, worked under Yeiter and testified that Yeiter was an ineffective manager, unable to manage a team. [Hartmann 35] Potter complained that, during Yeiter's short tenure, she failed to follow company procedures, isolated herself, failed to put projects on the whiteboard "one time the entire time she was there," was not a team player, and failed to manage her employees. [Ex. 6 - Potter II, 282-284] Laing similarly concluded that Yeiter

was not a good manager, testifying that Yeiter did "absolutely nothing" to address several of her subordinates being high at work, and had a habit of simply refusing to answer Potter's most basic questions. [Laing 162]

In February 2018, just a month after Yeiter became Marketing Manager, Potter emailed Yeiter a letter he had earlier sent to all of his managers, outlining failures in communications and in overall managing of employees. He hoped that her performance in these areas would improve, but it never did. [Ex. 17] A month later, Potter spoke with Yeiter in an effort to improve a deficient work flow process in the Marketing Department, which she never successfully created or implemented, and which ultimately contributed to her termination on May 20, 2019. [Ex. 18]

Throughout her tenure as a manager, Yeiter exhibited defiance and insubordination toward Potter and unprofessional behavior in the workplace. She permitted her staff to work irregular hours, giving rise to complaints of unequal treatment from employees in other departments. [Yeiter 70] She refused to cooperate, claiming her way was better. She also repeatedly refused to follow company procedure for the development of marketing materials and repeatedly presented materials due immediately that, according to procedure, should have been presented two weeks earlier. The result was rushed and substandard materials, along with disruption in the workplace. [Potter II, 282-284, 297-298]   In October 2018, Potter learned from a vendor that Yeiter had been ignoring the vendor's

requests for several months. [Ex. 19] This was typical of Yeiter's lack of follow through.   In November 2018, Potter had to counsel Yeiter regarding her disparagement of another Eden employee, directing her to correct her behavior and not undermine other employees. [Ex. 20]

In March 2019, Yeiter suspected that two employees were under the influence of drugs in the workplace. Eden's written Substance Abuse Policy requires that any employee in the workplace under the influence of alcohol or drugs be removed from the premises immediately, and be subject to immediate termination. [Ex. 12] Instead, Yeiter ignored the policy, and failed to address the employees at the time of the violation, despite having been counseled and trained by Laing on the process for handling such situations while dealing with another similar incident only a month before. [Yeiter 72-76] When Potter learned of the incident, he instructed Yeiter to meet with the employees and discipline them accordingly.  Yeiter responded merely that she would "deal with it" but again failed to act in a timely manner. [Ex. 21] Then, on April 25, 2019, Sam Stedman, an agent who places Eden's advertisements in select media, reached out to Yeiter with a "reminder" of an upcoming deadline for placement of an Eden Foods ad on May 17, 2019. Yeiter did not respond to Stedman until May 16, at 4:09 p.m., only hours before the deadline. The next day, on the deadline, Yeiter emailed Stedman claiming that she "forgot" about a critical element. Then, at 7:48 p.m., Yeiter submitted the ad without giving Potter the required time

for his review and approval. [Ex. 22] On Monday May 20, after she had already submitted the ad, Yeiter finally gave it to Potter, claiming that it was due the following day, which was not true.

Once given the opportunity to review the ad, Potter concluded that it was a "mess," and needed substantial work on his part to fix. Potter testified that he questioned Yeiter about why she was bringing this significant piece of work to him as an "urgent" problem, throwing it in his lap as an emergency. Potter explained that the mandatory procedure in the Marketing Department was to post a project on the department white board at least two weeks prior to the deadline, giving the entire marketing team the opportunity to provide input, and Potter time to review the project before submission. [Id. at 298-295] Yeiter's response to Potter's questions was to get "nasty" and raise her voice, abruptly leaving Potter's office, at which point he fired her. [Id.] Yeiter went into her office and began deleting company files from the computer system. [Id. at 303] She left, but continued to seek company documents, asking Erica Hartmann to steal confidential company records and send them to her. [Hartmann 113-115]

Yeiter never reported that she was harassed to anyone at Eden Foods, or to the EEOC before she was fired. [Yeiter 239-240]. Moreover, the only sexual harassment allegation she makes about Potter's conduct toward her was that he "scooted" his chair next to her and leaned in, touching her right side; that he "encircled" her with

his arms in the kitchen; and that he rubbed her shoulders. [Id. at 186-187] Notably, none of these allegations appeared in any complaint to anyone at Eden Foods, nor in her complaint to the EEOC, or her interview with the EEOC. [Exs. 14, 23] She never reported this to Laing or anyone else, until after she was fired. [Yeiter 239] In fact, several other witnesses, testified that this alleged harassment did not happen. [Holaday 46; Hartmann 121] Yeiter even sent her sister, an interior designer, to work with Potter in his home. [Yeiter 19]

### Scout Holaday Delicato

Holaday began employment with Eden Foods in September 2018 and quit just eight months later, on May 31, 2019, for another position. She gave an extensive exit interview to Laing and Hartmann. [Ex. 24] In it, she complained bitterly about being "shut out and lied to" by Julie Yeiter. She reported that Yeiter did not provide her with training, assignments, or deadlines, which "contributed to a lot of issues in the department." She also said that "[Potter] did a great job providing positive feedback verbally," and that she was "satisfied" with Eden Foods as a place to work. [Id. at 01005-1006] She likened the mistrust, gossip, and backstabbing among several of the women in the Marketing Department to her high school cheerleading squad, noting that "girls will be girls." [Holaday 78-79] Holaday admitted at deposition that while Potter did curse and say "f**k" when he lost his temper, she did not believe this had any sexual connotation. [Id. at 37] She also admitted that other employees in the

marketing department commonly swore, including saying "f**k." [Id. at 38]  She herself used the phrase "get it girl" and testified that phrases like this lack sexual connotations. [Id. at 130] Notably, what Holaday did not report in her exit interview was that she or anyone else at Eden had been sexually harassed by Potter. She admits, like all of the alleged aggrieved parties, that she never reported any sexual harassment to anyone, and like many of the witnesses, testified that she did not believe she was being sexually harassed until counsel for the EEOC persuaded her that she was being sexually harassed. [Id. at 123-124] Holaday was interviewed by the EEOC roughly one year after she resigned from Eden Foods.  [Ex. 25]

Holaday has asserted a mishmash of purported events to support her claim. She claims for the first time that Potter "leaned over her" at times when working on the computer, admittedly for the purpose of discussing *work*. [Holaday 47]. She testified that Potter once "brushed" her thigh, even though she told the EEOC investigator that it was her butt. [Id. at 8] Notably, she lists the alleged thigh brush last in her short list of complaints about Potter.  First on the list was that he yelled at her for misspelling "applesauce."  [Id.]  She complains now that Potter called her and others names like "lady" or "sweetheart" and that she heard Potter use the word "bitch." She says that Potter sometimes made a circle with his finger and thumb and say something about a "cat's ass." [Id. at 125] Finally, she claims that Potter touched her leg with his foot during a meeting. [Id. at  97]

10

**Tessa Sarapo**

Tessa Sarapo was hired for Eden's Sales Department in June 2015. In that role, she handled customer service calls, entered orders, prepared products for shipping and supported the sales managers. [Sarapo 27, 37] Reporting to Demian Potter (Michael Potter's son), Sarapo was "happy to be there." [Id. at 38] While working in the Sales Department, Sarapo became friends with Michael Potter, despite their age difference (which she admits to seeing nothing wrong with). [Id. at 68, 198] Potter occasionally stopped by her desk in the open Sales Department area, and they talked about shared interests. [Id. at 44-45] These chats had no sexual content at all. [Id.] By early 2018 Sarapo was regularly texting Potter. [Exs. 26, 28] For example, on June 21, 2018, she invited Potter to attend an event with her at the Co- op. [Id. at 02806-02807; Sarapo 118-120] That summer, Sarapo began talking frequently with Potter about how to develop her career in Eden's Sales Department, including how to show her supervisor the contributions she could make, if given the opportunity. [Sarapo 121-123, 1126-128] Potter suggested she put together a letter to Demian, her supervisor; Sarapo wrote a draft, and shared it with Potter for his suggestions. [Ex. 27] On July 17, 2018, Sarapo invited Potter to come over to her apartment after her Ypsi Co-op Board meeting; he suggested 9:00 p.m. Her response: "Perfect!" After Potter left, Sarapo continued texting him, at 11:33 p.m.: Thank you so much for coming over, I really appreciate you talking with me. And I hope your foot gets

11

better!" [Ex. 26 at 02809- 02810] A few days later, Potter texted Sarapo that he and Demian would soon be having their annual discussion of Sales Department wage structure, and asked Sarapo what it would take for her "to be able to stay focused on Eden Foods for us?" (Sarapo was starting a part-time job in a health foods store to supplement her Eden income). She responded: "$20 per hour, $22 per hour would cover what I'll be making with my second job……" [Ex. 28] Around the same time, Potter let know that he had recommended to Demian, who had agreed, that Sarapo attend a trade show in September 2018. [Ex. 26 at 02810; Sarapo 125] Sarapo showed particular interest in attending this trade show; it was the first show since she had started at Eden that she had not been invited to attend. A number of Eden employees attended, including Potter, Eden's event coordinator and a number of Sales Department employees. Danny Seo, a nationally known blogger and media personality, invited Potter to a dinner he hosted, to meet companies who might promote Eden Foods products. Sarapo and Dear attended the dinner, later thanking Potter for a great time. [Ex. 29] Sarapo then returned the favor, inviting Potter to attend a Chamber of Commerce holiday party in November 2018. [Ex. 26] To Sarapo, this was all good: "I thought it was a good thing to be recognized and acknowledged in the workplace by the owner." [Sarapo 166-167]

In May 2019, Eden's social media coordinator at the time, Scout Holaday, resigned to accept a new position with a higher salary and benefits. [Ex. 24] Potter

offered Sarapo the position, with several caveats: she would need significant training in her new position, and would need to devote 100% of her time and energy to Eden, which meant she would have to quit her other job. [Id. at 157-158; Ex. 30] Sarapo agreed, and in a May 24, 2019 text message, thanked Potter for the opportunity. [Ex. 26 at 02815)] Sarapo moved into the Marketing Department building in June 2019, reporting to Erica Hartmann.  She also continued her friendship with Potter; they took smoking breaks together after the training sessions he conducted with her were completed. During those breaks, they discussed marketing issues and ideas, as well as her upcoming trip to Spain, and his home renovations. [Sarapo 66, 85-86] The training sessions that Sarapo now reframes as sexual harassment were, as she admitted under oath, work sessions in which Potter tried to share his years of experience in successfully marketing Eden products, editing her work and teaching her.  [Id. at 141, 246-247] Sarapo was not always a willing student, however, seemingly believing that she knew far more than Potter. Explaining why she did not believe that Potter needed to train her, she testified:

> How would he know anything about social media? He's a 70-year-old man. He doesn't know any—he didn't even have any of these platforms, He didn't know anything about this. [Id. at 141]

Despite her apparent expectation that Potter would simply just let her do what she wanted [Id. 141] and that she would not be subject to any training, oversight or criticism, Sarapo soon learned otherwise, leading her to became unhappy in her new

position. In September 2019, she was disciplined for posting a personal Instagram of a pop-tart she had made, just a short time after one of Eden's paid influencers had done the same – a marketing effort Sarapo knew about. The influencer was upset, as was Sarapo's supervisor, Hartmann. Feeling betrayed by Hartmann, Sarapo blamed her for the problem. When Sarapo was suspended for 3 days for her poor judgment and refusal to accept responsibility, she told her family she was ready to quit. [Sarapo 103] In fact, she started looking for a new job at that time because "I thought they were going to fire me." [Id. at 100] However, when she received a solid performance review and raise in the next month, she decided to stay – at least until the next time her work was criticized. That happened on October 23, 2019, when Potter sent emails to Hartmann and Sarapo critical of their work. [Ex. 31] Sarapo could not take that criticism, texting her father that "Depending on how it is when I get back from lunch, I am prepared to leave today." [Sarapo 105; Ex. 32]. She admits that her plan to quit was triggered by Potter's critical emails– all of which were work-related. [Sarapo at 105] The next day, she wrote her father "I packed all my stuff. I'm putting in my notice on Monday. His psychotic breakdown passed and he became human for a moment." [Id. at 105-106, 108-109; Ex. 32]   It thus is evident from contemporaneous documents and Sarapo's own testimony that her issues with Eden and Potter had nothing to do with alleged sexual harassment but everything to do with the fact that she believed that she knew best how to do her job – despite having

no prior experience. She never reported sexual harassment (telling Sherri Laing only that she did not think that Potter needed to spend so much time training her), and did not file an EEOC Charge. [Sarapo 146, 173] Not until the EEOC invited her to join in on this effort to get monies from Eden in 2021 did she play any role in these claims. [Sarapo 9]

The claims raised by Sarapo are far from what is necessary to support a sexual harassment claim. She testified that Potter kissed her on the cheek twice, though the context of those strongly suggests his actions were not unwelcome.  [Id. at 176-179] The same goes for the claim that he tried to hold her hand at a homeopathic movie, for a minute or so. [Id. at 175] He allegedly told her she had "sexy legs," and allegedly once touched the moustache on her upper lip, immediately apologizing. [Id. at  87, 234] Sarapo testified that, at the Baltimore trade show, while waiting for a cab, Potter put his arms over the shoulders of Sarapo and Kaitlyn Dear, allegedly calling them his "hot dates." [Id. at 217] In almost three years, that is all.

### Kaitlyn Dear

In August 2016, Dear was hired by Eden Foods in the sales department. [Dear 44-45] Part of Dear's role was to attend tradeshows. [Id. at 54-55] Additionally, she was part of Eden Foods' Health and Safety Committee and planned company events, parties, and outings. [Id. at 62] In this latter role (which she described as being "the fun planner"), Dear had to obtain Potter's approval of the costs for the events she

put together. Potter came to her desk (in the open sales department area), looked at the information on her computer screen for a few moments, and approved the information. Potter did not make sexual remarks to Dear. [Id. at 75-76] Dear alleges that on a single occasion, when she went to Potter's office to get approval of documents, Potter said, "Oh, it's your birthday," and quickly hugged her. [Id. at 69, 113] While Dear suggests the hug made her uncomfortable, she did not say anything to Potter about it, and did not report it to HR. [Id. 72, 113 -14, 116-117]

In September 2018, as part of her regular duties, Dear attended a tradeshow in Baltimore on behalf of Eden Foods. [Id. at 12-13] While there, Potter, Dear and Sarapo attended a dinner hosted by blogger and media personality Seo.[Id. at 15-16; 83-85] After the dinner, according to Dear, she, Potter, and Sarapo  shared a cab to the hotel. Exiting the cab, Dear claims that Potter put his arms over her and Sarapo's shoulders and stated, "I have the two hottest dates tonight." Nevertheless, Dear describes this trade show as "a great experience."[5] [Id. at 119, 124] Finally, Dear claims that occasionally Potter looked over her shoulder while she was working at her computer. [Id. at 88] She admitted that when this happened, and she asked to move out of Potter's way, he switched spots with her. [Id. at 153-154] On September 27, 2018, Dear resigned for another job. [Ex. 33] She completed an exit interview that day. In that interview, she indicated that she would recommend Eden Foods as a place to work, and that the only aspect of her job that she was dissatisfied with was

"opportunities for advancement." [Dear 93, 95-96; Ex. 33]

## ARGUMENT

### I.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P.56(a).  The moving party need not "negat[e]" the non-moving party's case; but may prevail by "pointing out the "absence of evidence to support [that] case."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); Fed.R.Civ.P.56(c)1)(B). The non-moving party "must put forth sufficient evidence to demonstrate that there is a genuine issue of material fact; a mere scintilla of evidence is insufficient."  *Mullendore v. Belding*, 872 F.3d 322, 327 (6th Cir. 2017).

### II.    The Sexual Harassment Claims Are Legally and Factually Insufficient

Julie Yeiter, as well as the alleged "other aggrieved parties" relied upon by the EEOC are unable to present prima facie sexual harassment claims under either Title VII or ELCRA and so their claims should be dismissed. For a *prima facie* case, a plaintiff must show that (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendant knew or should have known about the harassment and failed to act. *Waldo v.*

*Consumers Energy,* 726 F.3d 802, 813 (6th Cir. 2013).[3] The U. S. Supreme Court requires "standards for judging hostility" to be "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment" and constitute actionable harassment. *Id.*

The alleged harassing conduct also must occur "because of" the gender of the person claiming injury. Allegedly harassing conduct does not automatically violate Title VII merely because the words used have sexual content or connotations. *Nathan v. GLWA*, 992 F.3d 557 (6th Cir. 2021). For conduct to be "based on [her] sex," the party must show that, but for the fact of her gender, she would not have been the object of harassment. *Bowman v. Shawnee State Univ.,* 220 F.3d 456, 463-64 (6th Cir. 2000). Next, to be actionable, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Syst.*, 510 U.S. 17, 21 (1993). In evaluating whether conduct is severe or pervasive, courts consider the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes

---

[3] The prima facie elements of an ELCRA harassment claim are the same as under Title VII. *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 468 (6th Cir. 2012)

with an employee's work performance. *Hawkins v. Anheuser-Busch.*, 517 F.3d 321, 333 (6th Cir. 2008)   "[S]imple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher, supra,* at 788.   To be actionable, the conduct "must be extreme." *Id.* Further, the alleged harassment, if directed at persons other than the plaintiff, must have been similar to that experienced by the plaintiff, observed by, or known to the plaintiff during her employment and not based on hearsay. *Id.* at 336; *Sperle v. Mich. Dep't Corr.,* 297 F.3d 483, 495 (6th Cir. 2002).

The Sixth Circuit has established "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Khalaf v. Ford Motor Co.,* 973 F.3d 469, 482–83 (6th Cir. 2020) , citing *Phillips v. UAW,* 854 F.3d 323, 328 (6th Cir. 2017). "For example, in the context of alleged racial discrimination, this court has determined that "even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Phillips* at 328. Accordingly, summary judgment was affirmed in *Clark v. UPS,* 400 F.3d 341, 344 (6th Cir. 2005), where the alleged harassment, consisting of  several sexual jokes, two instances of placing a vibrating pager on the plaintiff's thigh, and an incident in which the harasser tried to look down the plaintiff's overalls, was found not severe or pervasive, and in *Morris v. Oldham Cty.,* 201 F.3d 784, 790 (6th Cir.2000), where the harasser

told the plaintiff several inappropriate jokes, made a verbal sexual advance toward her, referred to her as "Hot Lips" and made comments about her clothes. In *Nathan, supra,* at 570, the court found that five incidents of sex-based harassment, including allegations that a supervisor placed her hands down the plaintiff's shirt to see if she was wearing a bra, during a fifteen-month period of time, were not severe or pervasive. *See also Baugham v. Battered Women.*, 211 F. App'x 432, 439 (6th Cir. 2006) ("Most, if not all, of Plaintiffs' allegations consist of one time occurrences that took place over a period of three years. Even considering them in the totality, we can hardly say the environment was permeated with discriminatory intimidation, ridicule, and insult.")

Courts have also concluded that calling an employee "hon" (as alleged in this case) is not sufficient to establish a hostile work environment claim. See, e.g, *Shaull v. Mich. Affiliated Health Care,* 1998 WL 1989810 (Mich. App. Sept. 22, 1998)[Ex. 34](Supervisor's repeated kisses to the back of the plaintiff's head, hugs and calling her "hon" not sufficient to establish hostile work environment). Moreover, as the *Shaull* court concluded, an occasional hug also does not constitute severe and pervasive sexual harassment. *Hensman v. Riverview,* 2008 WL 821940 (E.D. Mich. March 26, 2008)[Ex. 35](Three hugs from supervisor, who also walked too closely behind her, twice told her she was voluptuous, and closed the door when he met with the plaintiff in his office was not actionable sexual harassment.)

20

Here, where the allegations are best described as non-sexual incidental physical contact like "leaning over" employees while working at a computer station together; kissing the top of an employee's head on a birthday; and non-sexualized cursing, there is no genuine issue of fact that the alleged "harassment" does not meet the threshold.  Yeiter alleges only that Potter sat in a chair close to her desk; rubbed her shoulder, leaned over her desk and encircled her with his arms while at a kitchen counter. Holaday claims Potter called her "lady" and "sweetheart," touched her leg with his foot while seated at a table; and leaned over her. Dear alleges only that Potter once briefly hugged her (for her birthday), stood behind her, and placed his arms around her shoulder while exiting a cab. Sarapo – whose own conduct with respect to Potter calls into question whether any of his actions were unwelcome, cites, 2 kisses on her cheek, an arm around her shoulder and that of Dear, being told her she had sexy legs, and Potter sitting beside her for training on her new job. None of this is sufficient for an actionable hostile work environment claim. [4] Furthermore, under *Faragher, supra*, at  807-808, if the alleged harassment does not result in a "tangible employment action," an employer may raise an affirmative defense to liability, showing that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and the plaintiff employee unreasonably

---

[4] Each of these four must establish her own claim of harassment, based on their own experiences or what they personally observed while employed at Eden. They may not aggregate their claims in an effort to come up with a single actionable claim.

21

failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. Here, each of the allegedly harmed parties admits that she did not take advantage of any preventive or corrective opportunities provided by Eden Foods. [Yeiter II 239; Dear 116; Sarapo 173; Holiday 123] Their claims should be dismissed.

## III.   Yeiter Was Not Discharged In Retaliation for Protected Activity

Yeiter also alleges retaliation under Title VII and ELCRA.   The EEOC declined to pursue this claim on her behalf at all, evidencing its lack of merit.   Such claims are evaluated under the *McDonnell Douglas* burden-shifting scheme. *Morris*, *supra,* 201 F.3d  at 792. The plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a preponderance of evidence. If the plaintiff succeeds, the defendant may articulate a legitimate, non-discriminatory reason in support of its adverse action. This burden is one of production only, not persuasion. *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 142-43 (2000). Once the defendant articulates a legitimate, non-discriminatory reason, the burden returns to the plaintiff to prove that the legitimate and non-discriminatory reason offered by the defendant was not its true reason, but was instead a pretext for discrimination. The burden of persuasion remains at all times with the plaintiff. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

For a prima facie case of retaliation, the plaintiff must show that (1) she

engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken, and (4) there was a causal connection between the protected activity and the adverse employment action. *Niswander v. Cincinnati Ins.,* 529 F.3d 714, 720 (6th Cir.2008). "But for" causation between the protected activity and the adverse employment action is required. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 360-61 (2013). Yeiter thus must demonstrate that, but-for her alleged protected activity, she would not have been discharged. *See Jackson v. Gen. Cty. Rd. Comm'n,* 999 F.3d 333, 348-49 n.5 (6th Cir. 2021)("the causation element of Title VII and the ELCRA are the same"); *Beard v. AAA of Michigan,* 593 F. App'x 447, 452 (6th Cir. 2014); *Doss v. Mich. Dep't of Corr.,* 2022 WL 1086371, at *10 (E.D. Mich. Apr. 11, 2022)[Ex. 36].

Yeiter cannot meet this standard. First, she did not engage in any legally recognized protected activity. She did not even speak to the EEOC regarding the ongoing investigations until after she was fired. [Yeiter 163] She also did not report harassment to Eden Foods or anyone else. [Id. at 239-241, 269] Her claim rests on her allegation that, in January 2019, she told Laing that Laing might have "her hands full" with two EEOC charges filed by former employees. [Id. 163] Five months passed, during which Yeiter's performance continued to deteriorate, in the eyes of

her supervisor, Potter.[5]  It was not until mid-May 2019, when she submitted untimely advertising copy, lied about the deadline for the ad, and then argued with Potter regarding it all, that she was discharged. In fact, Yeiter admits that her termination resulted from Potter's dissatisfaction with the ad copy and deadline, and her response to him. [Id. at 142-144] Yeiter also concedes that she and Potter never discussed the pending EEOC charges and that it was merely her "belief" that Potter feared she would talk to the EEOC.  [Id. at 163, 165-166]  Potter, the sole decision-maker as to Yeiter's termination, was unaware of the statements Yeiter allegedly made to Laing about the EEOC charges. [Potter 287-288, 323] Yeiter thus cannot show that, but for her alleged protected activity, she would not have been discharged.  Further, even if Yeiter could establish a prima facie claim, it cannot be doubted that her failure to follow standard procedures requiring approval of advertising copy, her lie about when certain ad copy was due, her concealment of the fact that she had already submitted the copy and her argumentative response to Potter when he asked questions is a legitimate, non-retaliatory reason for termination. Yeiter cannot show that her termination was a pretext for retaliation, given that she admits she engaged in the underlying actions, and that those actions were the reason for her termination.

---

[5] A gap of four to five months between alleged protected activity and an adverse employment action is insufficient to support a prima facie retaliation claim. *Boshaw v. Midland Brewing Co.,* 32 F.4th 598, 605 (6th Cir. 2022) ("[t]hree months passed between [the plaintiff's] complaint to [his employer] and his termination, a firm indicator of a lack of causal link.)

Her retaliation claim should be dismissed.

## CONCLUSION

Based on the above facts and law, Defendants request that this Court grant

Defendants' Motion for Summary Judgment.

Respectfully submitted,

NEMETH BONNETTE BROUWER PC


/s/ Deborah Brouwer
Deborah Brouwer (P34872)
Attorneys for Defendants Eden Foods, Inc.
and Michael Potter
200 Talon Centre Drive, Suite 200
Detroit, MI 48207
(313) 567-5921
dbrouwer@nemethlawpc.com


HOOPER HATHAWAY, P.C.


/s/ Angela Jackson
Angela Jackson (P53930)
Attorney for Defendant Michael Potter
126 South Main Street
Ann Arbor, MI 48104
(734) 662-4426
ajackson@hooperhathaway.com

Dated: June 29, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2023, I electronically filed the foregoing document with the U.S. District Court's Clerk of the Court using the Court's electronic filing system, which will serve such filing upon all parties and/or counsel at their electronic addresses on record with the court.


Respectfully submitted,

NEMETH BONNETTE BROUWER PC


<u>/s/ Deborah Brouwer</u>
Deborah Brouwer (P34872)
Attorneys for Defendants Eden Foods, Inc.
and Michael Potter
200 Talon Centre Drive, Suite 200
Detroit, MI 48207
(313) 567-5921
dbrouwer@nemethlawpc.com